590 P.2d 169

STATE of New Mexico,
Plaintiff-Appellee,

v.

Reid WATKINS, Defendant-Appellant.

No. 3628.

Court of Appeals of New Mexico.

Jan. 9, 1979.

Thomas L. Grisham, Anita P. Miller, McCulloch, Grisham & Lawless, P. A., Albuquerque, for defendant-appellant.

Jeff Bingaman, Atty. Gen., J. Michael Francke, Don D. Montoya, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Chief Judge.

Convicted of perjury, defendant appeals. We discuss: (1) validity of the grand jury indictment; (2) use of taped conversations; (3) prosecutor as a witness; and (4) proof of a material false statement.

*Validity of the Grand Jury Indictment*

Section 31–6–3, N.M.S.A.1978, permits an indicted person to "challenge the validity of the grand jury" by motion.

Grounds that may be presented by such motion are limited to the following:

\* \* \* \* \* \*

B. a member of the grand jury returning the indictment was ineligible to serve as a juror; or

C. a member of the grand jury returning the indictment was a witness against the person indicted.

(a) The indictment was returned by a Sandoval County grand jury. Defendant moved for dismissal of the indictment, claiming the foreperson of the grand jury, Patricia Casaus, was not a resident of the county and thus was ineligible to serve as a juror. See N.M.Const., art. II, § 14. After an evidentiary hearing, the trial court ruled that Casaus was a resident. Defendant contends this ruling was error.

Residence is a question of fact. *Davey v. Davey,* 77 N.M. 303, 422 P.2d 38 (1967). In arguing that the trial court erred in ruling that Casaus was a resident, defendant reviews the evidence in the light most favorable to defendant. That is not the basis for appellate review; we review the evidence in the light most favorable to the State. *State v. Gonzales,* 82 N.M. 388, 482 P.2d 252 (Ct.App.1971).

Casaus was born and raised in Sandoval County. She desired to live separate from her parents. She looked for an apartment in the Town of Bernalillo, Sandoval County,

but was unable to find suitable accommodations. She rented an apartment on Albuquerque's North Second Street, described as being in Alameda, a community near the Town of Bernalillo, but physically located in Bernalillo County rather than Sandoval County. Defendant's contention that Casaus was not a Sandoval County resident is based on the fact that Casaus lived at this apartment most of the time.

The trial court found that Casaus maintained her permanent mailing address in Sandoval County, was employed in Sandoval County, was a registered voter in Sandoval County, "and she intends to return to Sandoval County and maintain her home there as soon as she can find suitable accomodations [sic]". Substantial evidence supports these findings. We do not review additional evidence inasmuch as the trial court's findings support the ruling that Casaus was a Sandoval County resident.

■ There is a similarity between residence for purpose of voting and residence for purpose of serving as a juror. Section 1-1-7(F), N.M.S.A.1978 states that for determining residence for voting:

[A] person does not lose his residence if he leaves his home and goes to another * * * place within this state for temporary purposes only and with the intention of returning[.]

In *State v. Wimby,* 119 La. 139, 43 So. 984, 121 Am.St.Rep. 507 (1907) the residence of a grand juror was attacked. The juror had lived and been employed in another parish for some months before returning to his "home" parish. *Wimby* holds that the temporary absence of the person from the parish of his residence, without the intention of abandoning that residence, will not destroy the person's qualification to serve as a grand juror. See also, *State v. Williams,* 57 N.M. 588, 261 P.2d 131 (1953) and *Klutts v. Jones,* 21 N.M. 720, 158 P. 490, 1917A L.R.A. 291 (1916).

Casaus was a resident of Sandoval County before renting the apartment in Bernalillo County. The trial court's findings are to the effect that Casaus never intended to change her Sandoval County residence.

The trial court properly denied the motion to dismiss the indictment on the ground that Casaus was ineligible to serve as a grand juror.

(b) The perjury charge is based on defendant's testimony before the grand jury. The grand jury which heard defendant's false testimony returned the indictment for perjury. Defendant contends: "[T]his is the same as Grand Jury members serving as witnesses against the person indicted"; that evidence as to defendant's perjury should have been presented to a separate grand jury.

Defendant does not claim that any member of the grand jury testified during the grand jury proceedings; thus, his "witness" claim is not that a juror was "called to give evidence regarding matters under inquiry by the grand jury." *State v. Hogervorst,* 90 N.M. 580, 566 P.2d 828 (Ct.App.1977). Defendant's claim is that having heard his false testimony, the jurors could not act impartially in determining that an indictment, charging perjury, should be returned. This claim is not a "witness" claim under § 31-6-3(C), supra; rather, it is a claim under § 31-6-3(B), supra, that because of bias, the jurors were ineligible to serve.

■ We assume there could be situations where grand jurors would be so prejudiced against a person that the jurors would be ineligible to serve because an indictment by jurors so prejudiced would violate their oath to " 'indict no person through malice, hatred or ill will' ". Section 31-6-6, N.M.S.A.1978. The fact that jurors heard false testimony does not, however, establish such prejudice. Indictments are based on "probable cause to accuse". Section 31-6-10, N.M.S.A.1978. The fact that the probable cause resulted from false testimony, heard by the jurors, does not establish that the jurors were unable to " 'present the truth' ", § 31-6-6, supra, or were unable to return an indictment based on the evidence.

■ Defendant's argument, essentially, is a policy question. Should jurors who heard the false testimony be permitted to indict on the basis of that false testimony? The

oath of jurors, § 31–6–6, supra, requires the jurors to inquire " 'of all public offenses' ". The charge to the jury requires the jury to inquire into "any public offense against the state committed and triable in the county". Section 31–6–9, N.M.S.A.1978. In carrying out the charge and their oath, "[i]t is not expected that in every instance, each grand juror shall be free from all previous knowledge of the cases, or even of the precise circumstances of the cases coming before them for official action". *Territory of New Mexico v. Young et al.,* 2 N.M. (Gild.) 93, 37 Pac.St.Repts. 93 (1881).

*Tindall v. State,* 99 Fla. 1132, 128 So. 494 (1930) states: "[T]hat if a witness swears falsely before a grand jury, it may, of its own motion and knowledge, indict such witness for perjury." *People v. Rallo,* 46 A.D.2d 518, 363 N.Y.S.2d 851 (1975), aff'd 39 N.Y.2d 217, 383 N.Y.S.2d 271, 347 N.E.2d 633 (1976) states: "[O]nce properly empaneled, the grand jury may indict for perjury committed before it".

 The grand jury could properly indict defendant for perjury on the basis of defendant's false testimony before that grand jury. Such an indictment is consistent with the juror's duty to inquire into public offenses. The fact that the jurors heard the lies did not, in itself, make the jurors ineligible to return the indictment. Defendant's motion to dismiss the indictment because the jurors heard the false testimony was properly denied.

*Use of Taped Conversations*

An interview of defendant by representatives of the attorney general's office was tape recorded. This interview is referred to as the first tape. Defendant taped conversations between himself and others, including Deputy Sheriff Tenorio. These conversations are referred to as the second tape.

At a pretrial hearing on a motion to suppress, counsel for the parties agreed that conversations, other than those on the first tape, would not be used in the State's case-in-chief. Counsel also agreed there was no agreement as to whether any of the conversations could be used for purposes of impeachment. Thereafter, an evidentiary hearing was held concerning the first tape. After this hearing, the trial court suppressed portions of the first tape, but ruled that the suppressed portions "may be used for purposes of impeachment."

Defendant testified. Portions of both the first and second tape were used by the prosecutor during cross-examination in an effort to impeach defendant's trial testimony. Defendant asserts this use was improper.

 Defendant contends the first tape was improperly used for impeachment because the statements used were part of plea bargain negotiations. Rule of Crim.Proc. 21(g)(6) states that pleas, offers to plea, or statements made in connection with pleas or offers to plea are "not admissible in any civil or criminal proceeding against the person who made the plea or offer." We do not decide whether, in the ordinary case, this rule prohibits use of such statements for impeachment purposes. Under the circumstances of this case, the rule did not bar the cross-examination.

Defendant asserts the second tape was improperly used for impeachment because, when used, the prosecutor knew, and defendant did not know, that Tenorio knew the conversation was being taped. On this basis, defendant asserts that the prosecutor used false testimony. Neither the claim that Tenorio knew the conversation was being taped, nor the claim that Tenorio's remarks were false, nor the claim that the prosecutor knowingly used any false remarks is supported by the appellate record.

 Defendant interjected the tapes into the trial during his direct examination. As to the first tape, he testified that the attorney general's office had promised that anything he said would not be used against him in court. As to the second tape, he implied that the attorney general's office had promised that the fact that defendant was taping conversations with others would be kept secret. This testimony was a claim, before the jury, of prosecutor misconduct, a claim designed to bolster the defense. Having

used the tapes on his own behalf, defendant now claims the prosecutor could not use the tapes in an effort to weaken the credibility of the defense. The fact that the parties emphasized different positions of the tapes is of no consequence when the issue is *whether the prosecutor could use the tapes to cross-examine defendant.*

Having interjected the tapes into the trial for his own purposes, defendant cannot properly complain of the prosecutor's use of the tapes, on cross-examination, to attack the credibility of defendant's trial testimony. Rule of Crim.Proc. 21(g)(6) does not prohibit such use. Use of the tapes under the circumstances of this case was proper. *State v. Harrison*, 90 N.M. 439, 564 P.2d 1321 (1977); see *State v. Borrego*, 52 N.M. 202, 195 P.2d 622 (1948).

*Prosecutor as a Witness*

During the presentation of the defense case, defendant sought to call attorney Don Montoya as a witness. Montoya was an assistant attorney general. He had questioned witnesses before the grand jury and was one of the prosecutors at defendant's trial.

The trial court required defendant to tender the testimony to be elicited from Montoya. After hearing this tender, the trial court refused to permit Montoya to be called as a witness. Defendant asserts this was error.

The tender had two aspects.

First, on appeal, defendant states that Montoya "could have provided evidence which would go to the issues of materiality of Watkins' testimony before the Grand Jury". This ambiguous appellate claim was more specific in the trial court. Defendant contended in the trial court that he wished to call Montoya as a witness because Montoya did the questioning before the grand jury, that Montoya was "the best witness for all of what exactly went on in that grand jury room." This information was available through the transcript of the grand jury proceedings; defendant was supplied a copy of that transcript.

Second, defendant wanted Montoya to testify "as to what Montoya had told Watkins concerning the use of statements made by Watkins against him at trial". "I believe the jury is entitled to know that Mr. Montoya told Mr. Watkins that those [statements] would not be used against him". What Montoya told defendant about use of defendant's statements is recorded on the first tape. The tape recording reveals that defendant also made a tape of the same interview. This information was available through those tapes.

■ "When a trial court refuses to allow a prosecutor to be called as a witness for the defense, the appellate issue is whether the trial court abused its discretion." *State v. Hogervorst, supra.* We do not consider whether the contents of the tender by defendant could have properly been admitted. We do consider the uncontradicted showing that the evidence sought to be offered by calling Montoya as a witness was available to defendant by other means. In these circumstances, the trial court did not abuse its discretion in refusing to permit the defendant to call Montoya as a witness.

*Proof of a Material False Statement*

Section 30–25–1, N.M.S.A.1978 states:

Perjury consists of making a false statement under oath or affirmation, material to the issue or matter involved in the course of any judicial, administrative, legislative or other official proceeding, knowing such statement to be untrue.

■ Defendant's false statements must have been material to the matter involved in the course of the grand jury proceedings. *State v. Montoya*, 77 N.M. 129, 419 P.2d 970 (1966). Defendant asserts the proof of materiality was insufficient to sustain his conviction.

There is evidence that during the evening of September 12, 1977, Sandoval County Sheriff White attempted to assault Deputy Sheriff Francia on the Jemez Dam Road north of Highway 44. Francia evaded the Sheriff and headed back toward the Town of Bernalillo, putting out a radio call for

assistance. A Town of Bernalillo police car responded, and told Francia to pull into the Pizza Hut parking lot. Francia did; the Sheriff followed "in just split seconds". According to Francia, the Sheriff got out of his car, went toward Francia and "started abusing me verbally again." About that time defendant arrived on the scene.

Defendant was a patrolman for the Sheriff's Department on the evening in question. He was told by the dispatcher to get to the Pizza Hut " 'right away' ". Defendant went to the Pizza Hut, "intervened" and brought an end to this second encounter between White and Francia on that evening.

Defendant wrote out a report, typed by another employee, concerning the Pizza Hut encounter. This typewritten report was reviewed by Tenorio who suggested changes which placed the Sheriff in a more favorable light. The report was revised in accordance with the suggestions and retyped. The revised report eliminated any reference to White "grabbing" Francia during the Pizza Hut encounter. We are not concerned with the accuracy of the report or the revised report.

The grand jury investigated the September 12, 1977 events. Defendant was called as a witness before the grand jury. Defendant denied that Tenorio told defendant to make changes in defendant's original report; stated that at the time of his discussion with Tenorio, he had only a handwritten report; denied the existence of two typewritten reports and denied making any changes in his original report. The falsity of this testimony is not contested; defendant admitted these falsehoods at trial.

Defendant's contention is that his lies to the grand jury were not material to any matter being investigated by the grand jury.

What was being investigated? The grand jury transcript shows defendant was advised that he was a possible target of the investigation, that he had a right to consult with an attorney, that he could refuse to answer any question that tended to incriminate him and that if he answered questions, he must answer truthfully. As a part of this advice, defendant was told:

> I want to advise you that this investigation centers around the incident which occurred on the night of September 12th as well as immediately after September 12th with certain documents that were prepared.

Defendant indicated he understood this advice. At trial, defendant testified that he figured that the grand jury was investigating "the incident, like I say, at the Pizza Hut." The questioning of defendant before the grand jury makes it clear that the Sheriff's activities at the Pizza Hut and defendant's report, or reports, of those activities were being investigated. Defendant's suggestion that he did not know what was being investigated, specifically, that defendant did not know that the jury was investigating a possible cover-up of the Pizza Hut incident, is without merit. Defendant was told that "certain documents" were included in the investigation.

■ Was defendant's false grand jury testimony material to the matter being investigated? The trial court instructed:

> False testimony is material if it has the capacity or tendency to influence the decision of the tribunal or inquiring or investigative body, or to impede the proceeding, with respect to matters which such tribunal or body is competent to consider.

Defendant does not challenge the correctness of this definition of materiality. See Annot., 22 A.L.R.Fed. 379 at § 2(a), page 383 (1975) from which the instruction was taken. Defendant's false testimony concerning his report of the Pizza Hut encounter and the revised version of the report excluding the reference to the Sheriff's grabbing of Francia, had "the capacity or tendency to influence" the grand jury investigating that incident. Defendant's claim that evidence of materiality was lacking is without merit.

The State's answer brief discussed the evidence of materiality in detail. Defendant's reply brief asserts the State's answer "misses the point".

The issue which is raised by Defendant * * * is *not* whether or not the false statements which he made before the Grand Jury were material. Rather, the issue is that the Attorney General failed to *prove* materiality of the statements made by "clear, convincing, and direct evidence for a moral certainty and beyond reasonable doubt."

Defendant cites some federal decisions which, he asserts, require such a quantum of proof. We do not review those decisions. The quantum of proof in New Mexico for conviction in a criminal case is proof beyond a reasonable doubt. U.J.I.Crim. 1.00; *State v. Henderson*, 81 N.M. 270, 466 P.2d 116 (Ct.App.1970); see *State v. Borunda*, 83 N.M. 563, 494 P.2d 976 (Ct.App.1972). The jury could properly find, under the evidence, that "materiality" was proved beyond a reasonable doubt.

Defendant contends that the proof of materiality was insufficient because there is no proof that defendant's false testimony "impeded in any way * * * [the grand jury's] investigation of the events of September 12th". This argument overlooks the definition of materiality. The false testimony did not have to actually impede or actually influence the grand jury's investigation to be material; rather, under the unchallenged instruction, the false testimony was material if it had the capacity or tendency to influence or impede the investigation. *United States v. Abrams*, 568 F.2d 411 (5th Cir. 1978). We have previously pointed out that the false statements were material under this definition.

Defendant submitted requested instructions defining "materiality" and does not contend that the instruction defining "materiality" was incorrect. On appeal, for the first time, he asserts that "materiality" should have been determined by the trial court as a matter of law and should not have been determined by the jury. This issue was not raised in the trial court and will not be considered. N.M.Crim.App. 308. See *State v. Reed*, 62 N.M. 147, 306 P.2d 640 (1957).

The judgment and sentence are affirmed.

IT IS SO ORDERED.

HERNANDEZ and LOPEZ, JJ., concur.